**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-CR-85-CRC-2** |
| **v.** | : | |
| | : | |
| **SIMONE GOLD,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Simone Gold ("Gold") to 90 days' incarceration, the middle of the stipulated advisory Sentencing Guidelines Range, one year of supervised release, 60 hours of community service, and $500 restitution.

**I.      Introduction**

The defendant, Simone Gold, a medical doctor and Stanford Law School graduate, and her boyfriend, John Strand ("Strand") (Case No. 21-cr-85-CRC-1),[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

---

[1] Strand has rejected the Government's plea agreement and is scheduled for a jury trial beginning July 18, 2022.

Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[2]

On March 3, 2022, Gold pleaded guilty to one count of 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds.  As explained herein, a sentence of ninety days' imprisonment, with probation to follow, is appropriate in this case because Gold: (1)  entered the Capitol Building near the Columbus doors outside the Rotunda immediately after a law enforcement officer was assaulted and dragged to the ground in front of her; (2) entered the Capitol through a door with smashed windows, joined and remained with a mob that was trying to break into the House Chamber, then moved to other areas while giving two different speeches to the crowd of rioters; (4)  ignored law enforcement commands to leave Statuary Hall, insisting on completing her speech; and (5) in an interview she gave with a reporter for the Washington Post shortly after the attack on the Capitol, Gold falsely claimed that event was peaceful, even though she personally observed other rioters push a police officer to the ground and was in a group of rioters that aggressively pushed past other police officers inside those doors.

The Court must also consider that Gold's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of

---

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

numbers.") (statement of Judge Chutkan). Here, Gold's general participation in a riot that halted the Congressional certification, her specific participation in a mob that tried to break into the House Chamber, her extensive time spent inside the Capitol despite multiple law enforcement requests for her to leave, and her lack of remorse, combine to render a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 58 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Gold's conduct and behavior on January 6.

### Simone Gold's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Simone Gold and John Strand traveled to Washington, D.C., from Tampa, Florida in anticipation of Gold giving multiple speeches regarding COVID-19 in Washington, D.C. in the lead up to the "Stop the Steal" rally. On the afternoon of January 5, Gold gave a speech at a rally in Freedom Plaza where she stated, "when you know something to be false you must reject it.  Period.  When you know something to be true, you must stand up for it, and you must be willing to fight for it.  I urge you to mark this day, this moment, as a united return of our nation to the eternal fight for freedom, a commitment to integrity, a resolve to seek the truth in all arenas and to always act upon it."

At approximately 2:38 p.m. Eastern Time on January 6, Gold and Strand were near the front of the initial mob of rioters to breach the East Rotunda Doors on the East side of the Capitol

building.  Prior to Gold and Strand entering the Capitol building, the broken windows to the East Rotunda Doors were clearly visible to anyone entering through those doors (as can be seen in Figure 1 below).



**<u>Figure 1</u>**

Before the rioters breached those doors, they violently dragged a U.S. Capitol Police Officer down to the ground right in front of Gold, as shown below In Figures 2 and 3:



**Figure 2**[3]



**Figure 3**

While other rioters helped the fallen officer to his feet, Strand and Gold made no effort to do so and, instead, breached the U.S. Capitol through the East Rotunda Doors at approximately 2:27 p.m. EST (as can be seen in Figure 4 below).

---

[3] The full video that Figure 2 is taken from has been uploaded to the Court as Government Exhibit 1.



**Figure 4**

After entering through the East Rotunda Doors, Gold and Strand walked through the Rotunda, Statuary Hall, and to the area outside the doors to the House Chamber (as can be seen in Figure 5 below).



**Figure 5**

Once Gold and Strand arrived at the doors near the House Chamber, they made their way to the front of the mob before it pushed past the outnumbered U.S. Capitol Police Officers trying to restrict their movement through the Capitol (as can be seen in Figures 6 and 7 below).



**<u>Figure 6</u>**



**<u>Figure 7</u>**

Gold and Strand arrived with the mob near the doors to the House Chamber at 2:28 p.m. At 2:35 p.m. the group stormed past another vastly outnumbered group of U.S. Capitol Police Officers. As Gold and Strand pressed toward the House Chamber door, members of the group chanted, among other things, "stop the steal," "we need to use our Kevlar to knock out those windows," and "break it down." Law enforcement officers inside the House Chamber had to draw their weapons in anticipation of the mob potentially breaking in.

Gold and Strand stayed near the House Chamber for approximately 25 minutes in total. At 2:53 p.m., they headed back in the direction from which they came towards Statuary Hall (as can be seen in Figure 8 below).



**Figure 8**

When they arrived at Statuary Hall the second time, Gold began to give a speech advocating the use of hydroxychloroquine to treat COVID-19 and condemning COVID-19 lockdowns. During the speech up to six U.S. Capitol Police Officers attempted to stop Gold and clear out Statuary

Hall, but Gold held her ground against the police officers.  In Figure 9 below you can see police officers attempting to clear Statuary Hall while Gold continues to give her speech.



**<u>Figure 9</u>**

In Figure 10 below, a police officer has come up to Gold to move her out of Statuary Hall, but Gold defies that police officer and continues to give her speech.



**Figure 10**

In Figures 11 and 12 below you can see that more police officers are having to be diverted from securing Statuary Hall, because Gold is continuing to ignore law enforcement and give her speech.



**Figure 11**



**Figure 12**

Gold began her first speech at 2:55 p.m. in Statuary Hall.  After the officers were able to

escort her out of that room, Gold moved to the Rotunda and began giving another speech, this time

using a bullhorn and standing on a Dwight D. Eisenhower statue, to a large crowd inside the

Rotunda, along the same lines as her previous speech.  Gold spoke for approximately five minutes

in the Rotunda. Figure 13 shows Gold giving her speech to a crowd in the Rotunda.



**Figure 13**

After nearly an hour inside, Gold and Strand eventually exited the U.S. Capitol building through the East Rotunda Doors at approximately 3:16 p.m.

*The Charges and Plea Agreement*

On January 13, 2021, the United States Attorney's Office charged Gold by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2). On January 28, 2021, she was arrested at her home in California. On February 5, 2021, a federal grand jury charged Gold in a five-count Indictment for violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 3, 2022, she pleaded guilty to Count Two of the Indictment, charging her with a violation of 18 U.S.C. § 1752(a)(1) for Entering or Remaining in a Restricted Building or Grounds. By plea agreement, Gold agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Gold now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Gold faces up to one year of imprisonment and a fine of up to $5,000. Gold must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Gold's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 32-41.

The U.S. Probation Office calculated Gold's criminal history as a category I, which is not disputed. PSR at ¶ 44. Accordingly, the U.S. Probation Office calculated Gold's total adjusted offense level, after acceptance, at 4, and her corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 44, 88. Gold's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96

(2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, a majority of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have

observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Gold's individual conduct, this Court should assess such conduct on a spectrum of aggravating and mitigating circumstances, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Gold personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Gold's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Gold from most other misdemeanor defendants.

Gold witnessed a U.S. Capitol Police Officer violently pulled to the ground and, without making any effort to assist him, continued into the Capitol, breaching the East Rotunda Doors. Gold and Strand spent almost an hour inside the Capitol, with much of their time spent toward the front of a large group of rioters who pressed up against the door of the House Chamber and threatened to break into it.  This was a highly sensitive and dangerous scene: law enforcement officers inside the House Chamber had to draw their weapons out of concern that the rioters would break into the Chamber.

Gold gave two speeches to rioters while inside the Capitol building, including a speech in the Rotunda in which a large crowd gathered around her to watch and be encouraged.  Gold refused to accede to the efforts of at least six U.S. Capitol Police Officers repeatedly trying to clear the rioters out of Statuary Hall, and obstinately continued making her speech.  Gold's conduct diverted officer resources and undermined law enforcement's ability to restore order to the Capitol.

A few days after January 6th, Gold gave an interview to the Washington Post.  In the interview Gold stated, "I can certainly speak to the place that I was, and it most emphatically was not a riot.  Where I was, was incredibly peaceful."

*See*  https://www.washingtonpost.com/investigations/simone-gold-capitol-riot-coronavirus/2021/01/12/d1d39e84-545f-11eb-a817-e5e7f8a406d6_story.html

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Gold's History and Characteristics

Gold's conduct demonstrates that her crime committed on January 6, 2021, was far from an aberrational act for which she is remorseful.  Rather, Gold refuses to take responsibility for her crime and, worse yet, she is actively using her crime to tarnish law enforcement, enrich herself, and cause harm through misinformation and vitriol.    The court should afford these factors significant weight in determining her sentence.

#### 1.  Gold Has Not Accepted Responsibility for Her Crimes

Gold's refusal to accept responsibility for her crimes should be at the center of the Court's evaluation of her character.  Her guilty plea reflects little more than her acceptance of the inevitability that she would be convicted for her criminal conduct, which was captured on undisputable video.  Her public posture, however, makes clear that she does not actually take responsibility for what she did.

17

Shortly after January 6, Gold lied to the Washington *Post* about purportedly observing an "incredibly peaceful" protest at the U.S. Capitol.  She offered no statement to the Probation Office beyond an acknowledgement of the statement of facts that she executed as part of her plea agreement.  *See* Presentence Report ¶ 31.  Even her acknowledgement of the statement of facts was undermined by her various challenges to certain facts to which she previously agreed.  *See* Objections by the Defendant, Presentence Report pages 22-23.

Further, more than three months after Gold changed her plea, the website for her organization, America's Frontline Doctors ("AFLDS"), continues to impugn her prosecution:

> Dr. Gold and her Communications Director were arrested by the FBI in an extremely aggressive manner . . . Clearly this political persecution of a law-abiding emergency physician is designed to threaten and intimidate any American who dares to exercise their 1st Amendment rights.

Ex. A, America's Frontline Doctors, "Alert: Dr. Simone Gold Urgently Needs Your Support", *available at*: https://securedonors.com/americasfrontlinedoctorsummit+campaignfr (last accessed: June 8, 2022).  Gold's public characterization of this case as a "political persecution of a law-abiding emergency physician" is not an accidental relic of an out-of-date website; to the contrary, the America's Frontline Doctors website was updated as recently as last week.  Gold's public insistence that she is the victim here—despite her deliberate participation in a violent riot—bespeaks a disturbing lack of remorse.  Worse yet, her false claim of being politically persecuted has potentially broad consequences because of her sizeable public following.

### 2. Gold Has Fundraised Extensively Off of Criminally Storming the U.S. Capitol

Gold has not merely declined to accept responsibility for her crime; she has gone so far as to actively profit from it.  America's Frontline Doctors has raised more than $430,000 through its website to support Defendant's legal costs.  Ex. A.  The call for donations explains that while "[a]ll funds raised will go directly toward legal costs for Dr. Gold", "[s]hould any funds remain, they

will be used to continue the life-saving mission of AFLDS." Ex. A.  Notably, the call for donations

makes no mention of Gold's guilty plea.  *Id.*

It beggars belief that Gold could have incurred anywhere near $430,000 in costs for her

criminal defense: after all, she pleaded guilty—in the face of indisputable, readily identifiable

evidence—without filing a single motion.  Gold therefore has seemingly leveraged her criminal

conduct to bring in hundreds of thousands of dollars to AFDLS, from which she draws $20,000

per month.  *See* Presentence Report ¶ 72.  It is axiomatic that criminal defendants should not profit

from their crimes.  Absent a significant sentence imposed by this Court, however, Gold's criminal

conduct will be a windfall for her.

### 3.   Gold's Medical and Legal Training Are Aggravating, not Mitigating Factors

The Court should reject any contention by Gold that her previous career as a doctor and

her legal education are mitigating factors.  They are not.  Among all the rioters who breached the

Capitol on January 6, Gold, as a trained doctor, could have been expected to exhibit care for the

safety of the officers who were being continuously threatened and assaulted.  Gold did no such

thing.  Rather, Gold ignored the plight of a Capitol Police Officer who was pulled into an

aggressive crowd right next to her, using it as an opportunity to force her way into the building.

Gold would go on to disrespect the physical and emotional trauma that the officers plainly suffered

that day by publicly claiming it was all "incredibly peaceful."

Similarly, Gold, having attended a premier law school, could be expected to have been

amply aware that entering the U.S. Capitol with a forceful mob, and rushing past broken windows

to do so, was illegal.  Gold could be expected to have had an understanding that breaking into the

House Chamber on the very day that, under established law, the United States Congress certifies

the results of the presidential election, would have particularly harmful consequences for our

democracy.  Yet Gold joined a mob that attempted to do exactly that, and she has no shown no

true remorse for doing so.   This factor supports a sentence of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The

violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the

democratic process."[4] As with the nature and circumstances of the offense, this factor supports a

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

probation. I think the presumption should be that these offenses were an attack on our democracy

and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gold's assertion to the Washington Post, that the riot was incredibly peaceful, which is contradicted by video evidence of her entry into the Capitol while other rioters battled with police officers trying to keep them out. shows a genuine lack of remorse,  .Moreover, Gold is not among the least culpable Capitol Riot defendants who only briefly entered the U.S. Capitol.  Rather, she remained inside for nearly an hour; she refused multiple commands to exit and thereby diverted officers' resources and attention; and she placed herself toward the front of a group trying to break into the House Chamber.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] *See United States v. Anna*

---

[5]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna*

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Gold has pleaded guilty to Count Two of the Indictment, charging her with entering or remaining in a restricted building or grounds, a violation of 18 U.S.C. § 1752(a)(1).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or

---

*Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentence imposed on Paul Von Berneiwitz, 21-cr-307.  This court sentenced him to 30 days incarceration based on the following: (1)    the defendant was among the initial crowd who breached the metal barriers that prevented access to the closed west side of the U.S. Capitol building; (2) video shows that the defendant watched as rioters pushed past U.S. Capitol Police Officers at two metal barrier lines; (3) after this,

the defendant and his brother observed people climbing up the electoral stage scaffolding on the west side of the U.S. Capitol building, yet they persisted and circled to the east side of the Capitol; (4) the defendant watched as people, including his brother, pushed against this police line, eventually breaking the line and surging up the east Capitol steps towards the Rotunda Doors; (5) he watched a rioter break windows and heard U.S. Capitol Police deploy flash-bangs and/or tear gas at the Rotunda Doors, yet he entered the U.S. Capitol building anyway, despite passing broken glass and hearing alarms; (6) he remained in the U.S. Capitol building for approximately 14 minutes; and (7) he minimized his own culpability in his interview with agents. Gold's conduct, by comparison, shares many of these characteristics, but she is sufficiently more culpable: she not only observed from a distance as rioters forcefully pushed past law enforcement officers to get int the Capitol, she took advantage of an officer right next to her being pulled violently away from the door and into the crowd; she remained in the Capitol for nearly an hour, including an extended period in which she joined a mob trying to break into the House Chamber; she ignored multiple requests from officers to exit the Capitol; she later made public statements diminishing the violence she observed; and she did all this despite the privileges of medical and legal training that should have taught her to know better.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

### V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Simone Gold to ninety days' incarceration, one year of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ April Ayers-Perez*
APRIL AYERS-PEREZ
TX Bar No. 24090975
Assistant United States Attorney
Detailee
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Office: 956-754-0946
April.Ayers-Perez@usdoj.gov

*/s/ Jason M. Manning*
JASON M. MANNING
NY Bar No. 4578068
Trial Attorney, Detailee
1400 New York Ave NW, 11th Floor
Washington, D.C. 20005
(202) 514-6256
jason.manning@usdoj.gov

26